**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| William Gilbert | : | |
| 752 Congress St. | : | |
| Marion, Ohio 43302 | : | |
| Plaintiff | : | |
| | : | Case No. |
| v. | : | |
| | : | Judge: |
| Silver Line Building Products, LLC | : | |
| dba Cornerstone Building Brands | : | |
| 5020 Weston Parkway Suite 400 | : | **COMPLAINT WITH JURY** |
| Cary, NC 27513 | : | **DEMAND ENDORSED HEREIN** |
| | : | |
| Defendant. | : | |

1. This is an action for damages for violations of the Americans with Disabilities Act ("ADA") as amended by the ADA Amendments Act 42 U.S.C.A. §12101 et. seq., Ohio law at ORC §4123.90, and Ohio Common Law.

2. This court has subject-matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) which states, in pertinent part: in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**PARTIES**

3. Plaintiff William Gilbert is a resident of Marion County, Ohio.

4. Defendant Silver Line Building Products, LLC dba Cornerstone Building Brands is a foreign corporation licensed and doing business in Marion County, Ohio.

**BACKGROUND FACTS**

5. Gilbert was employed as a Senior Transportation Specialist at Defendant's plant in Marion, Ohio beginning on February 19, 2018.

6. He was unlawfully terminated from that position on January 7, 2022.

7. As a truck driver, Gilbert was responsible for picking up and delivering raw materials and finished product to/from the Marion facility as well as delivering windows and doors to retailers.

8. His duties included unloading material from his truck which entailed lifting, pushing, and pulling.

9. On April 18, 2019, Gilbert was injured while delivering product to a lumber store in Michigan.

10. He slipped from the back of his trailer and fell headfirst.

11. Gilbert reached out his arms to break his fall and suffered serious injuries to both of his arms, including bilateral torn rotator cuffs, bilateral wrist sprains, and more.

12. Gilbert filed a workers' compensation claim with the Ohio Bureau of Workers' Compensation.

13. Despite his injuries, Gilbert continued working while undergoing physical therapy and conservative medical treatment.

14. He was assigned to light duty.

15. Although he continued driving, he was unable to unload his truck.

16. Thus, he performed drop and hook duties only.

17. The Company accommodated his restrictions.

18. Eventually, Gilbert's physicians took him off work to undergo two surgeries to repair his rotator cuffs. He remained off work from November 2019 until November 2020.

19. When he returned to work, he resumed his normal duties, but the condition of his right shoulder deteriorated.

20. In August 2021 his physician recommended light duty restrictions while he underwent additional treatment.

21. When he was placed on light duty, Shipping Manager Chad Miller expressed skepticism about his ability to perform the duties of his position.

22. Safety Manager Jared Boger suggested that he be assigned to perform shuttle runs between the plants in Marion, Ohio, Lansing, Illinois, and New Jersey.

23. These "shuttle runs" are a normal part of operations at the facilities and involve no unloading.

24. Drivers hook up to a loaded trailer, deliver it to its destination, where the trailer is unhooked, and the driver goes on his way.

25. Defendant's employees were normally assigned to perform these duties, but sometimes there were more loads than employees could handle so the loads were contracted out to a third-party trucking company (Dart).

26. Thus, it made perfect sense to assign Mr. Gilbert to perform this work and Mr. Miller agreed.

27. Gilbert successfully fulfilled these duties without issue. No performance concerns were ever expressed. He had good attendance and was sometimes called upon to train new drivers.

28. By taking over the New Jersey shuttles he saved the company money. He was able to complete the NJ shuttle run in half the time it took Dart drivers.

29. On December 9, 2021, Gilbert's physician advised him that his physical restrictions would be permanent.

30. He had not regained his range of motion and his doctor expressed that if he resumed repetitive heavy lifting, pushing, and pulling, his rotator cuff injury would reoccur.

31. Gilbert presented his permanent restrictions to his supervisor Richard Doak and the Safety Manager, Mr. Boger.

32. When Miller learned of the restrictions, he expressed displeasure.

33. Gilbert pointed out that his restrictions only prevented him from repetitive heavy lifting, pushing, and pulling and that he could continue the duties he had been performing for the last 4 months.

34. Gilbert was off work due to COVID-19 from December 27th until January 6, 2022.

35. When he was released to return to work, he sent a text message to his supervisor asking where he would be going on his next run.

36. He was informed that he should return and take a load to Lansing on January 7th. He reported for work at 2:30 a.m., picked up his trailer and completed his run.

37. Upon his return to the Marion facility later that day, Miller called him into the office, pulled out the document containing Gilbert's permanent restrictions and told Gilbert that they needed to go to HR to "put these permanent restrictions to rest."

38. Gilbert asked if he was being fired.

39. Although Miller denied that he was firing Gilbert, that is exactly what happened.

40. When they entered the HR office, Miller introduced Gilbert to HR Manager Sandy Musgrave.

41. Musgrave stated, "we don't provide permanent restrictions and light duty in our company for our employees. As of right now we need to part ways."

42. Gilbert was in disbelief. He asked, "you mean I'm being fired."

43. Musgrave preferred the term, "parting ways."

44. Gilbert expressed that he had been warned of this by supervisors and co-workers who had advised him of other employees who had been fired after filing a workers' compensation claim.

45. Musgrave denied that he was being fired for pursuing workers' compensation benefits.

46. Musgrave stated that they were "parting ways" with Gilbert because of his restrictions and need for light duty.

## ADMINISTRATIVE CHARGES AND NOTICE REQUIREMENTS

47. Gilbert notified Defendant of his intent to pursue his rights under ORC §4123.90 on February 18, 2022. (Exhibit 1).

48. Gilbert filed an EEOC charge alleging disability discrimination and retaliation on April 5, 2022, and a Notice of Right to Sue was issued by the EEOC on June 28, 2022. (Exhibit 2).

## COUNT I
## WORKERS' COMPENSATION RETALIATION
## IN VIOLATION OF ORC §4123.90

49. Plaintiff restates and incorporates the foregoing paragraphs as if fully rewritten herein.

50. When Gilbert pursued his right to file a workers' compensation claim, he was engaged in protected activity.

51. By terminating Gilbert's employment as described above, Defendant retaliated against him in violation of O.R.C. § 4123.90.

52. Gilbert has been damaged by Defendant's retaliatory termination of his employment.

53. Gilbert has complied with the jurisdictional prerequisites to this action by providing the Defendant with a notice of intent to pursue his rights under RC §4123.90 (Exhibit 1).

54. Gilbert has filed this action within 180 days of the adverse employment action.

## COUNT II
## DISABILITY DISCRIMINATION
## FAILURE TO ACCOMMODATE AND TERMINATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

55. Plaintiff restates and incorporates the foregoing paragraphs as if fully rewritten herein.

56. Defendant is an employer as that term is defined by the ADA.

57. Gilbert is an individual with a disability and/or is regarded as an individual with a disability as that term is defined by the ADA.

58. Gilbert suffers with a substantially limiting physical impairment.

59. Defendant was aware of Gilbert's disability.

60. Upon learning that his physical restrictions were permanent, Gilbert sought an accommodation from Defendant that would have allowed him to continue performing the essential functions of his position.

61. Gilbert's request for accommodation was reasonable as he was merely asking that he be allowed to continue performing the shuttle runs he had been performing for months.

62. Defendant has a policy of not accommodating permanent physical restrictions.

63. This policy is discriminatory on its face and constitutes direct evidence of disability discrimination.

64. Defendant refused to engage in the interactive accommodation process with Gilbert.

65. At the time of Gilbert's termination there was a vacant role for him to fill.

66. There was no legitimate, non-discriminatory reason for terminating Gilbert.

67. Gilbert has been damaged by the Defendant's failure to provide reasonable accommodations for his disability and by the unlawful and discriminatory termination of his employment, such that he is entitled to damages, therefore.

68. Defendant acted with willful disregard for Gilbert's rights such that he is entitled to punitive damages and attorney's fees.

### COUNT III
### RETALIATION IN VIOLATION OF
### THE AMERICANS WITH DISABILITIES ACT

69. Plaintiff restates and incorporates the foregoing paragraphs as if fully rewritten herein.

70. When Gilbert sought accommodation for his disability he was engaged in protected activity as that term is defined by the ADA.

71. Defendant was aware of Gilbert's protected activity.

72. Defendant terminated Gilbert because he requested accommodation.

73. Gilbert has been damaged by the Defendant's retaliatory termination of his employment, such that he is entitled to damages, therefore.

74. Defendant acted with willful disregard for Gilbert's rights such that he is entitled to punitive damages and attorney's fees.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court grant him:

a. lost past and future wages and benefits in excess of $75,000;

b. compensatory damages;

c. liquidated damages;

d. an amount in excess of $75,000.00 in compensatory damages for garden variety emotional distress;

e. an amount in excess of $75,000.00 for punitive damages;

f. attorney fees and costs;

g. prejudgment and post judgment interest;

    h.  such other equitable and further relief as may be just and appropriate.

                              Respectfully Submitted,

                              */s/Sharon Cason-Adams*
                              Sharon Cason-Adams (0067550)
                              AGEE CLYMER MITCHELL & PORTMAN
                              140 East Town St., Suite 1100
                              Columbus, Ohio 43215
                              Telephone: 614-221-3318
                              Facsimile: 614-221-7308
                              scasonadams@ageeclymer.com


## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues triable before a jury.

                              /s/*Sharon Cason-Adams*
                              Sharon Cason-Adams